UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

---

HASAN A. ELHANAFY,

                                        Plaintiff,

        - versus -

ERIC K. SHINSEKI,[*]

                                        Defendant.

MEMORANDUM
AND ORDER
10-CV-3192 (JG) (JMA)

---

A P P E A R A N C E S :

        HASAN A. ELHANAFY
                c/o Dana Strang
                55 Hills Road
                Latham, NY 12110
                Plaintiff, *Pro Se*

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201-1820
        By:     Timothy D. Lynch
                Assistant United States Attorney
                *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Hasan Elhanafy brings this lawsuit against his former employer, the U.S.

Department of Veterans Affairs ("VA"), alleging employment discrimination on the bases of

race, color, sex, religion, national origin, age, and disability. The VA has moved for dismissal

for lack of subject matter jurisdiction, or, in the alternative, for summary judgment. For the

---

[*]        The defendants named in the plaintiff's complaint are the United States Department of Veterans
Affairs and the New York Harbor Healthcare System. However, as discussed below, the proper defendant in a case
like this is the head of the relevant federal agency – here, Eric K. Shinseki, the Secretary of the Department of
Veterans Affairs. Accordingly, the Clerk of the Court is respectfully directed to amend the case caption to conform
it to the caption set forth here.

reasons explained below, the motion for dismissal for lack of subject matter jurisdiction is denied, but the motion for summary judgment is granted in its entirety.

BACKGROUND

A.     *Factual Background*

Hasan Elhanafy was hired by the VA on October 14, 2008, to work as a housekeeping aid in the Environmental Management Services ("EMS") division of the VA's New York Harbor Healthcare System located in Brooklyn, New York. Pursuant to VA regulations, his appointment was subject to a one-year probationary period. During this probationary period, Elhanafy's supervisors were required to observe and monitor his performance, provide training or counseling to correct deficiencies, and "[t]ake action to terminate a probationer who, after a fair trial, fails to demonstrate work characteristics necessary for satisfactory performance." VA Healthcare System Policy No. 05-10 (Lynch Dec.[1] Ex. 10) ("VA Probationary Policy"). Elhanafy was terminated by the VA effective September 25, 2009, roughly eleven months into his employment, and still within his probationary period.

Elhanafy's primary job responsibilities were to clean and service the VA facilities in Brooklyn, which consist of a "16-floor . . . medical facility and two buildings having non-housekeeping quarters, and a three-floor outpatient clinic building." VA Housekeeping Aid WG-3566-01 Position Description (Lynch Dec. Ex. 5) ("Position Description"). Elhanafy's duties included mopping, sweeping, waxing, and polishing floors; washing walls, doors, partitions, electric glass fixtures, dispensers, receptacles, windowsills, shower stalls, sinks, mirrors, commodes, toilet bowls, and urinals; refilling soap, towel, and toilet tissue dispensers; vacuuming rugs and drapes; emptying trash and cigarette receptacles; dusting and polishing furniture accessories; cleaning window shades and venetian blinds; removing soiled linen from

---

[1]     The Declaration of Timothy D. Lynch and its accompanying exhibits are filed at ECF No. 20.

beds; making beds; distributing clean linen and uniforms; and collecting, disposing of, and incinerating garbage and trash. *Id.* The job required Elhanafy to have knowledge of the techniques in mopping, buffing, and general cleaning, as well as the ability to read and write and to understand and follow instructions. *Id.*

From October 14, 2008, to February 3, 2009, Elhanafy worked the late shift, from 3:30 p.m. to 12:00 a.m. From February 4, 2009, until the date of his termination, he worked the early shift, from 7:00 a.m. to 3:30 p.m.

1. *Elhanafy's Internal Complaints*

Elhanafy submitted two incident reports to the VA during his employment there. In the first, Elhanafy reported that on December 29, 2008, at approximately 11:07 p.m., he entered the men's locker room to mop the area, but a male co-worker inside told him not to. *See* 12/30/08 Incident Report (Lynch Dec. Ex. 12). Two other male co-workers overheard the interaction. *Id.* When Elhanafy left the locker room, he heard the three male co-workers start "insulting all the new workers, especially [Elhanafy]," and they were "cursing and making rude references to [Elhanafy's] ethnicity." *Id.* Then, when Elhanafy and those three co-workers were leaving and taking the main elevator together, "the biggest of them[] approached [Elhanafy,] pointing his hands and finger towards [Elhanafy's] face, as if he was going to hit or punch [Elhanafy]. He was spitting at [Elhanafy] as he said, 'I will kick your little ass inside-out, whether in a Federal Building or outside on the street, right now.'" *Id.* In response to Elhanafy's complaint, which he submitted the next day, the night supervisor, Robert Maldonado, convened a meeting on December 30, 2008, with all four of the individuals involved. *See* 2/3/09 Handwritten Note by Maldonado (Lynch Dec. Ex. 13). When Maldonado asked them at the end of the meeting what he should do, Elhanafy apologized to the other three, and they all apologized

to Elhanafy. *Id.* "After everyone apologize[d] to each other [] all 4 staff members said it should stay between the 5 of us and not to go anywhere else. Everyone agreed." *Id.*

The second incident Elhanafy reported to the VA occurred on January 21, 2009. *See* 1/22/09 Incident Report (Lynch Dec. Ex. 14). Elhanafy's incident report, which he submitted the next day, reported that at the end of his shift, he got into the staff elevator with two other co-workers when one began telling him, "You're like a little girl and a pussy. I'm going to punch your teeth in, you little fag." *Id.* At the same time he was saying this, he was touching Elhanafy and pointing his fingers in Elhanafy's face, and pushing Elhanafy around inside the elevator. *Id.* He also "kept pressing the elevator key to close the door to let no one else in." *Id.* He continued insulting and pushing Elhanafy until they reached the basement. *Id.* Elhanafy stated that he reported the incident immediately to his supervisors, and said he has "a blood clotting condition and am currently taking Coumadin (Blood Thinner). One blow could be potentially life threatening." *Id.* Elhanafy concluded his report by saying, "I still have the same feelings since the last incident that I am being discriminated against because of my race. If another incident happens – I will have no choice to bring this to the attention of hospital administration and the Civil Liberties Union." *Id.*

2. *Complaints About Elhanafy*

Over the course of his employment, Elhanafy was the subject of numerous complaints and reprimands for excessive tardiness, poor work performance, and inappropriate conduct.

On January 27, 2009, Elhanafy's night shift supervisor, Maldonado, filed a written report to document disciplinary action against Elhanafy. *See* 1/27/09 Report (Lynch Dec. Ex. 8). Maldonado reported that he went to the third floor to check on Elhanafy, but he wasn't

4

there. Maldonado waited for a while, and then finally started looking for him. Maldonado

finally found Elhanafy on the ground floor with a drink in his hand. When Maldonado asked

him what he was doing there, Elhanafy said that he had brought a drink and that he was taking a

break. Maldonado told him this was wrong, instructed him to return to the third floor to finish

his assignment, and charged him with one hour of "AWOL" (absent without leave), for the hour

of 9:30 p.m. until 10:30 p.m. *Id.*

On February 2, 2009, Elhanafy's co-worker, Anthony Padgett, submitted a written

complaint to VA management about Elhanafy. *See* 2/2/09 Complaint (Lynch Dec. Ex. 15). The

complaint stated that Padgett had been assigned to work with Elhanafy on three occasions, and

each time, Elhanafy "disappears, leaves the assignment for hours (can't be asked why)." *Id.*

When Padgett would ask Elhanafy to help, Elhanafy would become "hostile" and would say

"don't tell [me] how to do my job," while holding a razorblade in his hand. *Id.* Padgett also

stated that Elhanafy "talks about sex, unprompted, unwarranted, statements that include himself

to me." *Id.* When Padgett asked Elhanafy "[w]hy the sex remarks," Elhanafy "got hostile, loud,

arrogant, and pointed his finger in [Padgett's] face." *Id.* Padgett said Elhanafy "made a false

report about it[,] trying to circumvent his behavior during the assignment."[2] *Id.* Padgett also

reported that Elhanafy had told him that Elhanafy had serious medical conditions that prevented

him from adequately assisting with assignments, and that Elhanafy had said that he believed he

was being discriminated against due to his physical condition, and so he is "trying to create legal

issues reviewable in court." *Id.*

---

[2]     Although the submissions do not reflect what "false report" Padgett is referring to, it appears
reasonably likely that Padgett was the individual involved in the January 21, 2009, incident in the elevator that
Elhanafy filed a report about. Padgett was not among the three co-workers involved in the December 28, 2008,
incident that Elhanafy also filed a report about.

On February 4, 2009, the EMS foreman moved Elhanafy to the early shift "due to a pending investigation." 2/4/09 Memorandum (Lynch Dec. Ex. 6).

On March 3, 2009, Elhanafy's immediate supervisor, Joan Brown,[3] filed a written report that at 8:50 a.m., Elhanafy had been found outside his assigned area – he was on the 16th floor instead of the 13th floor. *See* 3/3/09 Brown Report (Lynch Dec. Ex. 16). When asked why he was out of his area and why he didn't have enough water in his bucket if he was going to clean the bathroom, Elhanafy responded with different answers, "like [that] he forgot, then he stated that he came to get coffee, and also [that] he came upstairs to fill up his bucket." *Id.* He said he is a 40-year-old well-educated man and no one should speak to him like a child. *Id.* When Brown started explaining again where he was assigned, Elhanafy "suddenly stated that he cannot work for this department anymore, too much stress." *Id.* "He took off his ID card[,] laid it on top of the housekeeping cart and stated that he resigned and that he was going home." *Id.* Brown asked if he was sure, and Elhanafy said "yes, too much stress, these people here in this department don't like me, they treat me like I am a kid, and I am going home, I am resigning from this position." *Id.* However, when Elhanafy was brought to the EMS office, he said he wanted to work because he needed a job. *See* 3/3/09 Gray Report (Lynch Dec. Ex. 17). Sheila Gray, the assistant chief of EMS, explained to him that he should not surrender his badge and walk off the job, and that if he was having issues, he should speak to a supervisor or request to speak with Gray. *Id.* Elhanafy said his wife was sick and he was stressed out, so Gray offered

---

[3] In Joan Brown's affidavit to the EEO office, she stated that as of April 2010, she had been the "Housekeeping Supervisor" for two years and had acted as Elhanafy's immediate supervisor once he was transferred from the late shift to the early shift. Brown Aff. (Lynch Dec. Ex. 7).

him an opportunity to speak with EAP.[4]  *Id.*  Elhanafy responded that "he wasn't psycho," and went back to work.  *Id.*

On March 30, 2009, Brown submitted another written report, this time complaining that she had found Elhanafy smoking in the electrical room at around 10:45 a.m. *See* 3/30/09 Report (Lynch Dec. Ex. 18).  Brown asked Elhanafy, "Don't you know that there is no smoking allowed within the VA hospital?," and he said yes.  *Id.*  Brown told him to meet her at 2:15 p.m. with his union representative.  *Id.*  Elhanafy told her that it wouldn't happen again and asked to keep his cigarettes.  *Id.*  At the meeting that afternoon (with the union rep, Curtis Hill, present), Elhanafy signed Brown's incident report, and Brown handwrote, "Staff stated that he was under stress (refer him to seek EAP) and this will never happen again."  *Id.*

The very next day, on March 31, 2009, Brown filed another report.  *See* 3/31/09 Report (Lynch Dec. Ex. 19).  The report reads as a general complaint about Elhanafy's job performance and conduct:

> On 2/4/09, [Elhanafy] started working on the day shift.  We have tried to place him in different areas to work, but every time he is among other staff or employee[s] we receive complaints.  He is not allowed on the 8th floor, 15th flr, 12th flr, 11th flr or on 16th flr.  He does not get along with anyone, reason why shift changed.  Everything you give him to do he complains that it is other people[']s job that he is doing. . . . [H]e ends up getting in trouble.  He is always roaming the corridors.
>
> He cannot work in any ward area by himself or with others.  We cannot accommodate this kind of behavior here in the EMS department.

*Id.*

---

[4]  According to the official website of New York State, "EAP" stands for Employee Assistance Program, a program that "addresses whatever problems are affecting an employee's productivity.  Individual problems can range from a need for information about child care to serious difficulties with alcohol or drugs."  *See* New York State, Employee Assistance Program, http://worklife.ny.gov/eap/ (last visited May 14, 2012).

On April 6, 2009, Brown filed another report, stating that at around 1:30 p.m. on April 3, Elhanafy had been found mopping the stairs without displaying any wet floor signs and with a "trail of water going up two floors." *See* 4/6/09 Report (Lynch Dec. Ex. 20). Brown came to the scene and asked about the missing signs and the trail of water. *Id.* Elhanafy said he was using the wet floor signs to prop the door open so the stairs would dry faster, and he was using extra water in order to try to finish the work faster by doing more than one floor at a time. *Id.*

On April 8, 2009, the EMS chief, Lennox Joslyn, submitted to the chief of human resources an official request to terminate Elhanafy during his probationary period. *See* 4/8/09 Termination Request (Lynch Dec. Ex. 27). Joslyn stated that he was "requesting that [Elhanafy] be terminated during his probationary period due to his unsatisfactory performance, conduct and general traits of character." *Id.* Joslyn explained that Elhanafy "is unable to meet the needs of the VA," and listed the following reasons supporting Elhanafy's termination:

A)  Poor attendance – consistently late for work.
B)  Promotes a hostile environment – has made racist remarks towards African-American employees.
C)  Willful idling – on numerous occasions has been found outside of work area, wandering with no legitimate reason.
D)  Smoking in the facility – was caught smoking in an electrical room.

*Id.* It appears that no immediate action was taken on this termination request.

On April 9, 2009, Brown filed a report indicating that at about 2:35 p.m., which was not a break time, she had come across Elhanafy sitting in the hallway reading a newspaper. *See* 4/9/09 Report (Lynch Dec. Ex. 21).

On May 7, 2009, Elhanafy received two written "counseling" memoranda from Brown. The first informed him that from November 7, 2008, to May 7, 2009, he had had "an

excessive amount of lateness." *See* 5/7/09 Tardiness Memo (Lynch Dec. Ex. 24). The memo

proceeded to list 31 days that Elhanafy had been late for work, by how much, and whether the

lateness was classified as leave without pay or annual leave. *Id.* The latenesses had occurred

both while Elhanafy was on the early shift and while he was on the late shift.[5] The memo told

Elhanafy that "any future lateness, that is found unacceptable, may be charged Absence Without

Official Leave (AWOL). Any charges of AWOL may lead to appropriate action." *Id.* Elhanafy

signed off on this "tardiness counseling statement." *See* 8/24/09 HR Report (Lynch Dec. Ex.

26).

The second "counseling" memorandum that Elhanafy received on May 7, 2009,

informed him that he had been found in violation of the rules and regulations on numerous

occasions in the following ways:

> A. On more than one occasion you have made comments to
> your co-workers that were sexual in nature and
> inappropriate for the workplace.
> B. Willful idling – On numerous occasions you have been
> found to be outside of your assigned work area without
> proper permission. You were wandering without a
> legitimate reason.
> C. On March 30, 2009, you were found smoking a cigarette
> inside of an electrical room. Smoking inside of the facility
> is prohibited.

5/7/09 Counseling Memo (Lynch Dec. Ex. 28). The counseling memorandum explained that if

future incidents of this nature occur, "appropriate disciplinary action will be taken." *Id.* Given

that he was still on a probationary period, "[i]f a determination is made that your conduct,

general character traits, or capacity do not meet the requirements for satisfactory service[,] action

may be taken to terminate your employment." *Id.* Elhanafy acknowledged receipt of the

memorandum by signing his name and dating it May 8, 2009. *Id.*

---

[5] Seven of the listed days occurred while Elhanafy was still on the late shift; the remaining 24 days occurred after he had been switched to the early shift on February 4, 2009.

On July 15, 2009, Brown filed a report saying that it had taken Elhanafy over an hour to get his mopping equipment together that morning.  *See* 7/15/09 Report (Lynch Dec. Ex. 22).  Then, once he started, he again used the wet floor sign to prop the door open, even though he had been told not to do that on previous occasions.  *Id.*  He told Brown that he did that because it made it easier for him to finish faster.  *Id.*  Even so, Brown wrote, "he uses [an] excessive amount of water to clean the stairs," and "[h]e has not retained anything that has been taught to him."  *Id.*  Brown concluded that Elhanafy "is not a good employee for this department."  *Id.*  "[W]e cannot keep constantly supervising him," she wrote.  *Id.*  "The constant talking to and the constant reminder is very redundant."  *Id.*

On August 24, 2009, Brown filed a report listing all of the days on which Elhanafy had been late since receiving his tardiness warning on May 7, 2009.  *See* 8/24/09 Lateness Report (Lynch Dec. Ex. 25).  Elhanafy had been late on 13 days between May 8, 2009, and August 24, 2009, and had been marked AWOL for 12 of those.  *Id.*; 8/24/09 HR Report (Lynch Dec. Ex. 26).  Brown said that each time she asked Elhanafy why he was late, "his answer will either be I overslept, my alarm did not go off, or I forgot if today was my day off. There is never a legitimate reason why."  8/24/09 Lateness Report.  Brown submitted a copy of Elhanafy's time reports to human resources to be evaluated for either admonishment or termination.  8/24/09 HR Report.

On August 26, 2009, Brown filed a report stating that Elhanafy had been found out of his assigned area.  *See* 8/26/09 Report (Lynch Dec. Ex. 23).  He had roamed into a staff member's office and had started to dust her area without her permission.  *Id.*  The staff member reported that Elhanafy had then touched her and made her feel uncomfortable, so she called the office to inform them of the situation.  *Id.*  When Brown asked Elhanafy about the encounter, he

said that the staff member had asked him to vacuum her room, and plus, "he always like[s] to do extra stuff even if people do not ask him to." *Id.* Brown concluded the report by writing "[t]his employee cannot work well around anyone. This employee is not right for this department." *Id.*

Finally, on September 4, 2009, Ryan Gill, the acting chief of the human resources department, sent Elhanafy a letter terminating Elhanafy's employment effective September 25, 2009. *See* Termination Letter (Lynch Dec. Ex. 2). Because less than a year had passed since Elhanafy's appointment on October 14, 2008, this termination was within his probationary period. *Id.* The letter explained that the chief of EMS had requested Elhanafy's separation for (1) continuing excessive lateness despite the May 7, 2009, warning; (2) failure to follow instructions and proper procedures on many occasions, despite multiple reminders; and (3) willful idling and wandering outside of his assigned work area without legitimate justification. *Id.* The letter informed Elhanafy that he would continue to be paid for his services until September 25, 2009. *Id.*

3.     *Elhanafy's Informal Discrimination Complaint to ORM*

On September 15, 2009, Elhanafy went to the VA's Office of Resolution Management ("ORM") to seek informal EEO counseling[6] regarding his termination. *See* 9/16/09 ORM Opening Letter (Lynch Dec. Ex. 29). The EEO counselor subsequently sent Elhanafy a confirmation letter, assigning his claim a case number (200H-0630-2009104740) and describing his claim as "termination during the probationary period," with its bases as "[s]ex (male) and national origin (Egyptian-American)." *Id.* The counselor told Elhanafy that if this information was incorrect, he should advise him within five days of receipt of the letter. *Id.* Elhanafy did not

---

[6]     "EEO" stands for Equal Employment Opportunity. Such counseling is provided for by the Equal Employment Opportunity Commission ("EEOC") regulations for federal employees, which provide in particular that "[a]ggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105.

advise the EEO counselor of any errors in that report, and completed, signed and returned the

ORM Notice of Rights and Responsibilities form on September 22, 2009. *See* ORM Rights &

Resp. (Lynch Dec. Ex. 30).

On October 22, 2009, Elhanafy's EEO counselor informed Elhanafy by letter that

his informal counseling matter was being closed. *See* 10/22/09 ORM Closing Letter (Lynch

Dec. Ex. 32). The letter informed him that he could file a formal administrative EEO complaint

within 15 days. *Id.*

4.      *Elhanafy's Formal EEO Complaint*

On October 27, 2009, Elhanafy filed a formal complaint of employment

discrimination. *See* EEO Complaint (Lynch Dec. Ex. 33). Elhanafy left blank the section that

directed him that "[f]or each employment related matter that you believe was discriminatory, you

must list the bases," and which provided the options of race, color, religion, sex, national origin,

age, disability, and reprisal for prior EEO activity. *Id.* Under remedies sought, Elhanafy wrote

simply, "I want my job back!" *Id.* Elhanafy attached a separate sheet of paper on which he

disputed point (B) from Joslyn's April 8, 2009, termination request letter, namely that Elhanafy

"[p]romotes a hostile environment – has made racist remarks toward African-Americans." *Id.*;

*see also* 4/8/09 Termination Request (Lynch Dec. Ex. 27). Elhanafy wrote that

> there weren't any documents to support this claim I have never
> made any racist remarks, I am Egyptian-African-American and I
> am appalled by being place[d] in this situation due to false
> accusation. As a matter of fact, I was asked by the Chief Lennox
> Joslyn[] if I don't like African-Americans.
>
> On several occasions employees of Environmental
> Management Service have repeatedly tell me 'you're a terrorist,
> you are going to blow up this place.' After being subjected to such
> taunts and ridicule and accusation, who is the victim and who is
> the harasser?

EEO Complaint.  To explain "just a few of the incidents which occurred" on which he was basing his complaint, Elhanafy also mentioned that:

> Ms. Cheryl Pritchett, foreman [of EMS] ordered a couple of employees to threaten me to drop my case of harassment. Afterward several employees cornered me in an elevator and started beating on me, while disabling the elevator so no one could get in the elevator to come to my rescue.
>
> Ms. Sheila Grey, Assistant Chief[,] pulled me into the office and stated[,] 'Are you in my department to cause problems'? I replied no she then dismissed me from her office.
>
> I went to Mrs. Greys' [sic] office to report a problem and was told to leave the office; she did not want to hear from me.

*Id.*

On November 20, 2009, a regional EEO officer notified Elahanfy in writing that his EEO Complaint had been accepted for investigation and further processing.  *See* 11/20/09 EEO Acceptance Notice (Lynch Dec. Ex. 34).  The Notice of Acceptance advised Elhanafy that the claim that would be investigated was:  "Whether on the bases of national origin (Egyptian) and sex (male), the complainant was discriminated against with respect to termination when: On September 25, 2009, the complainant was terminated from his probationary period."  *Id.* Elhanafy was informed that if he believed the accepted claim was improperly formulated, he should notify the office within seven days of receipt of the letter indicating his disagreement.  *Id.* No such statement of disagreement appears in Elhanafy's file.

On February 18, 2010, Elhanafy was notified in writing that an EEO investigator had been assigned to investigate his EEO Complaint.  *See* 2/18/10 EEO Letter (Lynch Dec. Ex. 35).  In connection with his investigation, the EEO investigator solicited affidavits from Elhanafy (Lynch Dec. Ex. 1), Brown (Lynch Dec. Ex. 7), Gray (Lynch Dec. Ex. 9), Amanda Burns, a labor/employee relations specialist at the VA New York Harbor Healthcare System

(Lynch Dec. Ex. 4), and Ryan Gill, the acting chief of the human resources department who had made the final decision to terminate Elhanafy's employment (Lynch Dec. Ex. 36).

In Elhanafy's EEO affidavit, completed on April 10, 2010, in response to the question, "How and when did the individual responsible for terminating your employment become aware of your national origin?," Elhanafy wrote, "They made a meeting just for me and ask[ed] me if I hate[d] black ppl and ask where I was from of the Middle[-]East. A month later called back to sign a termination form." Elhanafy Aff. at 2 (Lynch Dec. Ex. 1). In response to the question, "Why was the termination of your employment not acceptable to you?," Elhanafy wrote, "I was asked if I hated black people and I was ignored by the assistant chief and most of the supervisors when I was trying to get help." *Id.* at 3. When asked whether he was aware of a co-worker in the same position as himself who did the same things Elhanafy was accused of doing but was not terminated during his or her probationary period, Elhanafy wrote, "Don't know." *Id.* When asked the follow-up question of how this comparator was treated differently than him, Elhanafy wrote, "Am an African-Egyptian-American[.] I personally didn't see any different." *Id.* at 4.

When asked why he believed he was discriminated against because of his national origin, Elhanafy wrote, "I was always being ignored by supervisors and the chief assistan[t] of the department." *Id.* As "direct evidence of discrimination related to national origin," Elhanafy wrote, "I was asked if I hated black people. I was ignored all the time." *Id.* When asked why he believed he was discriminated against because of his sex, Elhanafy wrote "Am an Egyptian-African-American male." *Id.* As direct evidence of discrimination related to his sex, Elhanafy wrote, "I've always being attacked by other coworkers and I've had to drop the cases from what they have told me to drop the cases or else I will be terminated." *Id.*

Question 24 of the affidavit questionnaire asked Elhanafy how he responded to the issues listed in his counseling memorandum of May 7, 2009, regarding idling, smoking, and inappropriate sexual comments. Elhanafy wrote, "Its all a lie. Everyone does they work the supervisor[s] are never around when you need their help except for a few." *Id.* at 5. The affidavit questionnaire also asked Elhanafy how he responded to the May 7, 2009, tardiness memorandum. Elhanafy wrote, "Not true, they added more days and mo[re] time. They have always done that the old fashion way, by writing by hand. Also everyon[e] else do come late to work, everyone." *Id.* When asked how he responded to the reasons provided by Gill in his September 4, 2009, termination letter, Elhanafy wrote, "Not true. I don't know Mr. Ryan Gil." *Id.* at 6.

On August 20, 2010, Elhanafy received a Final Agency Decision from the VA's Office of Employment Discrimination Complaint Adjudication, explaining to Elhanafy that his EEO Complaint was being dismissed because the office had received notice that Elhanafy had filed this lawsuit. *See* EEO Final Agency Decision (Lynch Dec. Ex. 37). The letter explained that according to EEOC regulations, the agency is directed to dismiss any EEO Complaint that has been pending for more than 180 days if it receives notice of a pending civil action that raises the same claims as the EEO Complaint. *Id.*

B.      *Procedural History*

Elhanafy filed the instant lawsuit on July 6, 2010, using a form questionnaire provided by the court's *pro se* office. *See* Compl. (ECF No. 1). To assert the legal bases of his claim, Elhanafy checked all three discrimination statutes listed on the form: Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"); and Americans with Disabilities

Act of 1990 ("ADA"), 42 U.S.C. §§ 12112-12117.  *Id.*  Elhanafy checked boxes indicating that

the discriminatory conduct of which he complained was: "[t]ermination of my employment";

"[f]ailure to accommodate my disability"; and "[r]etaliation."  *Id.* ¶ 4.  In the "[o]ther acts"

section, although he did not check the corresponding box, Elhanafy wrote, "I was always

ignored."  *Id.*  When asked to indicate the bases for the discrimination against him, Elhanafy

place a mark next to every option on the form: race, color, gender/sex, religion, national origin,

age, and disability.  *Id.* ¶ 7.  He did not provide elaboration for what his race, color, gender/sex,

or religion were.  *Id.*  He provided that his national origin was "Egypt," his age was "40," and his

disability was "hearing, blood clots condition."  *Id.*  When asked to explain the facts of his case,

Elhanafy wrote:

> Wrongfully terminated.  I was asked racist ??? at a couple of
> meetings that I attended; I was not able to express myself about my
> job or around my co-workers.  I had to drop a few complaints I've
> made and reported against my co-workers so I can keep my job.  I
> tried to ask for help when I really needed it, they never[] want to
> hear it from me I was made fun of around co-workers.

*Id.* ¶ 8.

Using the same *pro se* questionnaire, Elhanafy amended his complaint on January

20, 2011.  *See* Am. Compl. (ECF No. 10).  Again Elhanafy placed checkmarks indicating he was

relying on Title VII, the ADEA, and the ADA.  *Id.*  In the amended complaint, he enlarged the

scope of the allegedly discriminatory conduct underlying his claims, indicating through

checkmarks that he was complaining about: termination of his employment; failure to promote;

failure to accommodate his disability; unequal terms and conditions of his employment;

retaliation; and "[o]ther acts."  *Id.* ¶ 4.  Elhanafy elaborated on the "[o]ther acts" category by

writing, "I was confronted at a meeting and forced to answer a question: 'Do I hat[e] black

peop[le.]'"  *Id.*  Elhanafy again checked off every possible discrimination basis, again without

elaboration regarding his race, color, gender/sex, or religion. *Id.* ¶ 7. For national origin, he again wrote "Egypt," for age he wrote "41," and for disability he wrote, "I have a medical condition and hearing condition – cannot hear from left ear[;] deep vein thembrosis [sic][;] see Attachment A." *Id.* Elhanafy explained the facts of his case as follows:

> (1) Wrongful termination, failure to accommodate my disability, which resulted in lateness. Chronic fat[igue], depression, DVT.
>
> (2) I was abused verbally and physically by co-wo[rkers] and threatened by co-workers and supervisors on numerous [o]cca[s]ions while at the job. See attached complaints.
>
> (3) I was singled out because of my religion and my race and national origins.
>
> (4) Because I stood up for my rights and filed numerous complaints against the population that is primarily black I was accused in a meeting that was attended by supervisors and a union rep and assistant – during this meeting I was forced to answer the question do I hate black people. This was in my opinion a discriminatory statement question which they asked repeatedly and forced me to answer.

*Id.* ¶ 8. Elhanafy noted that he may not live at his address of record for much longer because "the housing marshals will kick me out of that place, due to termination I owe over $16,000 rent." *Id.* at 6.

Elhanafy attached two handwritten attachments to this amended complaint. The first, purportedly from Elhanafy (though seemingly drafted by someone else based on the handwriting), explained that Elhanafy was seeking $500,000 in his lawsuit as well as reinstatement of his employment. *Id.* at 7. He explained, "My termination was based on lateness with my medical conditions being completely ignored." *Id.* He attached a doctor's record dated December 8, 2010, indicating that he had been diagnosed with deep vein thrombosis (DVT) and insomnia, among other things. *Id.* at 9. Elhanafy also stated that 2.5 of the lateness hours listed in his termination letter had been previously approved by his supervisors. *Id.* at 7. Elhanafy

wrote that "I had called in most latenesses due to my wife's deteriorating health." *Id.* Elhanafy concluded by writing, "I was discriminated against due to my religion and ethnicity. I was also physically threatened. . . . I was threatened numerous times and even held in an elevator and pushed around by two coworkers." *Id.* at 8.

A letter from Elhanafy's wife, Teresa Gallo, addressed to the president of the AFL-CIO Local 1867 and dated September 11, 2009, was also attached to the amended complaint. *Id.* at 10. In the letter, Gallo wrote that Elhanafy had been hospitalized for a pulmonary embolism only two weeks before starting his VA job, and he was still in a weakened physical condition when he started the job. *Id.* at 11. She explained that Elhanafy was still on Coumadin for blood clots, which leaves him tired and confused. *Id.* As a result, she was "horrified" when she learned of the physical threats made to Elhanafy, as "his medication makes him a 'bleeder' and one punch could be potentially fatal." *Id.* She said that Elhanafy had been late on various occasions, but these latenesses were "due to either his physical conditions or factors outside himself that effect [sic] his physical condition and timeliness." *Id.* at 12. She explained that she had been hospitalized for hormone dysfunction problems, and she keeps Elhanafy up at night because she doesn't sleep well. *Id.* Moreover, she explained that they had "problems with a next door neighbor that has a severe drug addiction who is at our door all hours of the night and ringing our phones." *Id.* She stated that Elhanafy also suffers from mild depression and fatigue syndrome. *Id.* Also, she said that they "did have a few alarm clock failures that was solved by a new alarm clock, which we failed to operate properly causing [Elhanafy] to be late an additional few days." *Id.* at 13.

Gallo summarized her points in bullet-point fashion at the end of her letter, listing Elhanafy's medical conditions as "fatigue; depression; DVT – deep vein thrombosis, currently

on Coumadin therapy." *Id.* at 14. She listed her own medical conditions as: "several hospitalizations for heart & thyroid. [Elhanafy's] sleep is constantly interrupted by my insomnia due to hormone problems." *Id.* The other two factors she listed were: "[s]evere trouble with the neighbor ringing our bell, knocking, calling our phones all hours of the night," and "[d]rug trafficking outside our window at night is constant with many calls made to the 62nd precinct." *Id.*

The VA filed the fully-briefed motion to dismiss or, in the alternative, for summary judgment on March 6, 2012. ECF No. 20. On March 21, 2012, the case was reassigned to me after Judge Kuntz recused himself. *See* ECF No. 27 (letter from Elhanafy requesting that Judge Kuntz recuse himself); Minute Entry dated March 21, 2012 (reflecting recusal). I held oral argument on the motion on April 6, 2012.

DISCUSSION

A.    *The Motion To Dismiss for Lack of Subject Matter Jurisdiction*

As an initial matter, the VA suggests I should dismiss Elhanafy's lawsuit for lack of subject matter jurisdiction, because he failed to name the proper defendant under the relevant statutes. VA Mem. at 4 (ECF No. 23). The VA makes this argument less than one paragraph after acknowledging that complaints drafted by *pro se* parties are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

Title VII, which prohibits employment discrimination on the bases of race, color, religion, sex, and national origin, provides that for actions brought by federal employees, "the head of the department, agency, or unit, as appropriate, shall be the defendant." 42 U.S.C. § 2000e-16(c). The Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701, *et seq.*,

under which I construe Elhanafy's disability discrimination claim to arise,[7] incorporates the

procedural requirements for suits under Title VII, *see* 29 U.S.C. § 794a(a)(1), and therefore also

requires that the head of the department be the named defendant in any civil action. The ADEA,

which prohibits age discrimination, does not specify who the proper defendant should be.

Nonetheless, because the ADEA provision applicable to federal employees was patterned after

Title VII, courts have similarly held that the proper defendant in a federal employee's ADEA suit

is the head of the agency. *See, e.g.*, *Ellis v. U.S. Postal Svc.*, 784 F.2d 835, 838 (7th Cir. 1986)

(holding that Title VII's rule that "the only proper defendant is the head of the agency" should

also apply to actions under the ADEA); *Healy v. U.S. Postal Svc.*, 677 F. Supp. 1284, 1289

(E.D.N.Y. 1987) ("Since both [Title VII and the ADEA] should be construed consistently, this

court holds that the only proper party defendant in a suit against the Postal Service under the

ADEA is the Postmaster General of the United States."); *cf. Bornholdt v. Brady*, 869 F.2d 57, 65

(2d Cir. 1989) (noting that because ADEA § 633 was patterned after Title VII's provisions,

"[w]e have analogized the ADEA to Title VII in formulating burden-of-proof and order-of-proof

standards for ADEA suits, and other circuits have been guided by parallel provisions in Title VII

in interpreting § 633a [with regard to] proper party defendant" (citing *Ellis*, 784 F.2d at 838)).

Elhanafy named as defendants in this lawsuit the VA and the New York Harbor

Healthcare System (which apparently is the name of the particular VA hospital where Elhanafy

worked). Admittedly, he did not name the head of the relevant agency or department as a

defendant. However, rather than dismissing Elhanafy's lawsuit on this ground with leave to

---

[7] Although Elhanafy purports to bring a claim under the ADA, federal employees must bring disability discrimination claims under the Rehabilitation Act rather than the ADA. *See, e.g.*, *Carter v. Potter*, No. 06-CV-3854 (JG), 2007 WL 879417, at *4 (E.D.N.Y. Mar. 22, 2007) (explaining that because "the ADA may not provide [the *pro se* plaintiff] with a cause of action here, . . . I deem her disability claim to be brought pursuant to the Rehabilitation Act."); *see also Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ("As a federal employee, [the plaintiff] has no remedy for employment discrimination under the ADA."); *DiPompo v. West Point Military Academy*, 708 F. Supp. 540, 544 (S.D.N.Y. 1989) (holding that the Rehabilitation Act is the exclusive remedy for federal employees claiming employment discrimination based on handicap).

replead in order to name the correct defendant, I hereby substitute the Secretary of the Department of Veterans Affairs, Eric K. Shinseki, as the defendant in this lawsuit. I find this simple correction accords with my obligation to "construe complaints filed by *pro se* litigants liberally," *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006), and does not prejudice the defendant in defending the action, as the Secretary of the VA "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15. The case caption will be amended accordingly.

In light of this correction, the defendants' motion to dismiss the complaint for lack of subject matter jurisdiction is denied.

B.      *The Motion for Summary Judgment*

1.      *Exhaustion*

a.      *Exhaustion Requirement under Title VII and the Rehabilitation Act (for Race, Color, Sex, Religion, National Origin, and Disability Discrimination Claims)*

Exhaustion of administrative remedies is a prerequisite to filing a civil lawsuit under Title VII or the Rehabilitation Act. *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) (Title VII); *see also* 29 U.S.C. § 794a(a)(1) (incorporating under the Rehabilitation Act the procedural requirements for suits under Title VII). In order to be administratively exhausted, claims in a civil lawsuit must either have been expressly asserted in the employee's EEO complaint or else be "reasonably related" to the allegations raised therein. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2011).

A claim is considered "reasonably related" to the allegations of an administrative complaint where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."

*Butts v. City of N.Y. Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993)

(internal quotation marks omitted), *superseded on other grounds by statute*, 42 U.S.C. §

1981(b).[8]  This is "essentially an allowance of loose pleading."  *Id.*  In other words, because the

purpose of the exhaustion requirement is "to give the administrative agency the opportunity to

investigate, mediate, and take remedial action," *see Stewart v. United States INS*, 762 F.2d 193,

198 (2d Cir. 1985), "[a] new allegation will be considered reasonably related [to an allegation in

an administrative charge] if the administrative charge provided the EEOC with sufficient notice

to investigate the allegation." *Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d

Cir. 2011).

      Elhanafy's EEO Complaint[9] expressly raised only national origin and sex

discrimination claims.  The VA's EEO office specifically informed Elhanafy that it had

construed his claim to raise the question of whether Elhanafy was discriminated against "on the

bases of national origin (Egyptian) and sex (male) . . . with respect to termination."  11/20/09

EEO Acceptance Notice (Lynch Dec. Ex. 34).  Elhanafy did not indicate any disagreement with

this formulation, even when told he should notify the office within seven days if he believed the

claim was improperly formulated.  *Id.*  The conclusion that Elhanafy's EEO Complaint raised

only sex and national origin discrimination claims is further supported by the fact that his

---

[8]      A claim is also considered "reasonably related" to a claim in an EEO complaint if "it alleges retaliation for filing the EEOC charge; or [] the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'"  *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402-03).  Neither of these two routes is available to Elhanafy, as (1) all of the alleged discriminatory conduct occurred *prior* to Elhanafy's EEO complaint and therefore could not have been retaliatory; and (2) the amended complaint does not allege any further incidents of discrimination that were carried out in precisely the same manner as the conduct alleged in the EEO charge.

[9]      The Second Circuit has held that a federal employee properly exhausts his administrative remedies by bringing a complaint to his agency's EEO office in the same way that a private claimant exhausts administrative remedies by bringing a charge to the EEOC.  *Terry v. Ashcroft*, 336 F.3d 128, 150-51 (2d Cir. 2003); *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001); *see also* 29 C.F.R § 1614.106 (providing that federal employees must file a discrimination complaint "with the agency that allegedly discriminated against the complainant").  Thus, because Elhanafy was a federal employee, I look to the EEO complaint that he submitted to the VA to determine which grounds of discrimination he has administratively exhausted.

preceding informal discrimination complaint to the ORM was similarly construed to be based on only "[s]ex (male) and national origin (Egyptian-American)" discrimination. *See* 9/16/09 ORM Opening Letter (Lynch Dec. Ex. 29). Elhanafy did not advise the EEO counselor of any errors in that formulation, as he had been told to do, and indeed he adopted the formulation by completing and signing the ORM Notice of Rights and Responsibilities form and returning it to the counselor. *See* ORM Rights & Resp. (Lynch Dec. Ex. 30).

Accordingly, Elhanafy's claims for race, color, religion, and disability discrimination are unexhausted and barred from review unless they are "reasonably related" to the claims actually contained in Elhanafy's EEO Complaint. As a general matter, "claims alleging discrimination based upon a protected classification which are different than the protected classification asserted in administrative filings are not reasonably related." *Culbertson v. Charosa Found. Corp.*, No. 03-CV-3742 (SJF) (LB), 2004 WL 2370686, at *3 (E.D.N.Y. Oct. 18, 2004) (collecting cases).

Charitably, Elhanafy's claims of race and color discrimination may be considered reasonably related to his complaint of national origin discrimination, because he referenced being called a terrorist by his co-workers, which he indirectly attributed to his national origin, but an investigation into the claim might reasonably have considered whether the taunts were based on his color, as well. In addition, Elhanafy refers to being asked whether he didn't like African Americans. Although Elhanafy included this allegation in his EEO Complaint in the context of responding to one of the asserted grounds of his termination ("promotes a hostile environment – has made racist remarks towards African-American employees"), its inclusion at least raises the specter of a possible race discrimination claim.[10] Accordingly, I will treat

---

[10] Also, Elhanafy's internal complaint dated January 22, 2009, plausibly would have led the EEO office to enlarge the administrative investigation to include a claim of race discrimination, based on Elhanafy's

Elhanafy's claims of race and color discrimination as exhausted, in addition to his claims of national origin and sex discrimination.

However, nothing in Elhanafy's EEO Complaint even plausibly suggested discrimination on the basis of religion, age, or disability. The administrative complaint "could not reasonably be expected to have triggered an investigation into the allegations of [religion, age, and disability] discrimination []he now raises." *Culbertson*, 2004 WL 2370686, at *3. Thus Elhanafy's claims of religion, age, and disability discrimination are patently unexhausted and procedurally barred, and are therefore dismissed.

### b. *Notice Requirement under the ADEA (for Age Discrimination Claim)*

Under the ADEA, although federal employees need not file an EEO complaint as a precondition to sue, they must give the EEOC 30 days' notice of their intent to sue before filing a civil action. *See* 29 U.S.C. §§ 633a(d). Such notice must occur within 180 days of the alleged discriminatory incident. *See id.* Although the notice-of-intent-to-sue requirement is not an absolute jurisdictional requirement, *see Castro v. United States*, 775 F.2d 399, 403 n.4 (1st Cir. 1985) (per curiam); *Ray v. Nimmo*, 704 F.2d 1480, 1483 (11th Cir. 1983), the ADEA is clear that it functions as a procedural bar to the claim, providing that "*no civil action* may be commenced by any individual under this section until the individual has given the Commission *not less than thirty days' notice* of an intent to file such action." 29 U.S.C. §§ 633a(d) (emphasis added). Procedural requirements for gaining access to federal courts must be strictly adhered to. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984). Failure to follow such requirements may be excused only on equitable grounds. *See Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 59 (2d Cir. 1986) (noting that ADEA's administrative filing deadline is subject

---

statement that "I still have the same feelings since the last incident that I am being discriminated against because of my race." *See* 1/22/09 Incident Report (Lynch Dec. Ex. 14).

to equitable modification or estoppel) (citing *Zipes v. Transworld Airlines, Inc.*, 455 U.S. 385, 394-95 (1982) (holding that Title VII requirement of timely filing of EEOC charge is subject to equitable modification and tolling)).

The uncontested facts here indicate that Elhanafy never filed any notice of his intention to sue for age discrimination with the EEOC prior to filing this lawsuit, nor did he pursue an EEO administrative complaint for age discrimination.  Accordingly, Elhanafy failed to comply with the ADEA's mandatory notice requirement – a necessary precondition to his bringing suit.  No equitable principles counsel in favor of excusing this procedural defect; Elhanafy has suggested none, and I have found none.[11]  Elhanafy's ADEA claim is therefore dismissed.  *See, e.g.*, *O'Malley v. GTE Serv. Corp.*, 758 F.2d 818, 822 (2d Cir. 1985) (affirming dismissal of ADEA claim for failing to follow filing requirements, "see[ing] no grounds to lift the statutory bar"); *Hunter v. Rice*, 531 F. Supp. 2d 185, 190 (D.D.C. 2008) (holding that failure to comply with ADEA's notice requirement renders claim "barred by the plain language of the ADEA itself").

    c.    *Exhaustion of Alleged Discriminatory Conduct*

The only adverse employment action that Elhanafy expressly asserted in his EEO Complaint was his termination from employment.  *See* 11/20/09 EEO Acceptance Notice (Lynch Dec. Ex. 34) (accepting EEO complaint "with respect to termination").  Indeed, the only remedy Elhanafy sought in his EEO Complaint was "I want my job back!"  EEO Complaint (Lynch Dec.

---

[11]    *See Cherry v. City of New York*, 381 F. App'x 57, 59 (2d Cir. 2010) (affirming dismissal of ADEA claim and denying equitable tolling of exhaustion requirement because "[e]quitable tolling is only appropriate in rare and exceptional circumstances, such as when a party is prevented in some extraordinary way from exercising his rights" (internal quotation marks and alterations omitted)), *cert. denied*, 131 S. Ct. 940 (2011), *reh'g denied*, 131 S. Ct. 1628 (2011); *Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 563 (2d Cir. 2006) ("While the ADEA's time limit requirements are subject to equitable modification or estoppel, ADEA time limits are not to be disregarded by courts out of a vague sympathy for particular litigants[.]" (internal citations and quotation marks omitted)), *aff'd*, 552 U.S. 389 (2008); *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (2d Cir. 1984) (affirming summary judgment on Title VII claim for failure to timely file, holding that "in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day").

Ex. 33). The EEO Complaint did not mention any alleged failure to promote, unequal terms and conditions of employment, or retaliation. *Cf.* Am. Compl. ¶ 4 (asserting these claims in lawsuit). Accordingly, Elhanafy's claims based on the alleged discriminatory acts of failure to promote, unequal terms and conditions of employment, and retaliation are unexhausted and procedurally barred unless they are "reasonably related" to the claims actually contained in Elhanafy's EEO Complaint.

Nowhere in Elhanafy's complaint is there even a suggestion of a failure to promote. For example, there is no mention of any available position that he applied for but did not receive, nor of any promotions of his peers that he felt he was passed over for. Any claim based on a failure to promote is therefore unexhausted and procedurally barred, and is hereby dismissed.

Elhanafy's EEO Complaint did, however, suggest a possible claim for retaliation in response to Elhanafy's internal complaints. Elhanafy mentions in his EEO Complaint that one of his supervisors "ordered a couple of employees to threaten me to drop my case of harassment." EEO Complaint (Lynch Dec. Ex. 33). In an internal complaint dated January 22, 2009, Elhanafy said that he had the "feeling[]" that he was "being discriminated against because of [his] race." *See* 1/22/09 Incident Report (Lynch Dec. Ex. 14). Thus, the VA might reasonably have investigated the possibility that Elhanafy was retaliated against for his internal complaint of race discrimination, even though retaliation wasn't expressly asserted as a basis for his EEO Complaint. Accordingly, to the extent Elhanafy brings a claim for retaliation based on his earlier internal complaints, I will treat it as exhausted.

Similarly, to the extent Elhanafy brings a hostile work environment claim, it too is reasonably related to Elhanafy's EEO Complaint. Although his complaint sought only a

reinstatement of employment, and the claim was construed by the EEO office as complaining only of termination, Elhanafy's typed attachment to his EEO Complaint says that he was repeatedly called a terrorist by his co-workers, leading him to rhetorically ask, "After being subjected to such taunts and ridicule and accusation, who is the victim and who is the harasser?" EEO Complaint at 2 (Lynch Dec. Ex. 33). Elhanafy also mentions the elevator incident as one of the "incidents . . . which I am basing my complaint on." *Id.* Therefore, a hostile work environment claim is plausibly within the scope of a reasonable EEO investigation into the allegations of Elhanafy's complaint, and therefore such a claim is not precluded from review.

In sum, the claims in this lawsuit that I will treat as having satisfied statutory exhaustion requirements are Elhanafy's claims for termination, hostile work environment, and retaliation, on the alleged discriminatory bases of race, color, national origin, and sex. Elhanafy's claims of discrimination on the bases of religion, age, and disability, and those predicated on any alleged failure to promote, on the other hand, are unexhausted and thus dismissed.

2. *The Merits*

a. *Standard of Review*

"Summary judgment may be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit under the governing law." *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (internal quotation marks and alteration omitted). "A fact[ual dispute] is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). In making the

determination as to whether summary judgment is appropriate, the evidence must be construed in the light most favorable to the nonmoving party (here, Elhanafy), and all reasonable inferences must be drawn in his favor. *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).

    b.   *Analysis*

      (i)   *Discrimination*

  As discussed in the section on exhaustion above, I may reach the merits of Elhanafy's claims for discrimination on the bases of national origin, sex, race, and color. However, the claims are clearly meritless.

  To make out a *prima facie* case for discrimination under Title VII, the plaintiff must show the following four elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; (4) the adverse employment action occurred under circumstances that give rise to inference of discrimination. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Although an employee's burden in establishing a *prima facie* case "is neither onerous nor intended to be rigid, mechanized or ritualistic," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001), Elhanafy has failed to establish the second and fourth elements above, even viewing the facts in the light most favorable to Elhanafy.

  Firstly, Elhanafy has not demonstrated that he was qualified for the position; indeed, the facts clearly demonstrate the opposite. Elhanafy was terminated while he was still a probationary employee of the VA. The VA's own policies require it to terminate any probationary employee "who, after a fair trial, fails to demonstrate work characteristics necessary

for satisfactory performance."  VA Probationary Policy (Lynch Dec. Ex. 10).  Elhanafy was

chronically late for work, registering 44 tardies in just over nine months.  The tardiness persisted

in spite of a counseling memorandum in May 2009 warning Elhanafy that "any future lateness . .

. may lead to appropriate action."  5/7/09 Tardiness Memo (Lynch Dec. Ex. 24).  Additionally,

Elhanafy was repeatedly cited for being away from his work area, taking unauthorized breaks,

and poorly performing his maintenance tasks.  On one occasion, he was found smoking in the

electrical room at the facility. *See* 3/30/09 Report (Lynch Dec. Ex. 18).  His conduct was so

problematic that by March 31, 2009, his supervisor had concluded that Elhanafy "cannot work in

any ward area by himself or with others."  3/31/09 Report (Lynch Dec. Ex. 19).  Thus, Elhanafy

clearly failed to demonstrate that he was qualified for his position as a housekeeping aid.

Moreover, even if Elhanafy had been qualified for his position, the circumstances

of his termination do not give rise to an inference of discrimination.  In fact, the head of the

maintenance department submitted an official request to terminate Elhanafy during his

probationary period back on April 8, 2009.  *See* 4/8/09 Termination Request (Lynch Dec. Ex.

27).  The EMS chief stated that Elhanafy should be terminated "due to his unsatisfactory

performance, conduct and general traits of character."  *Id.*  Elhanafy's termination – far from

occurring under circumstances giving rise to an inference of discrimination – followed logically

and directly from a considered and consistent impression among his supervisors that his

performance was unsatisfactory and his conduct inappropriate for the workplace.

(ii)     *Hostile Work Environment*

Elhanafy appears to assert a hostile work environment claim in his complaint, by

alleging that he was "abused verbally and physically by co-wo[rkers] and threatened by co-

workers and supervisors on num[e]rous [occasions] while at the job."  Am. Compl. ¶ 8.  He

supplements this assertion in his attachment to his complaint, in which he states, "I was also physically threatened so much as my wife feared for my safety every time I left for work. . . . I was threatened numerous times and even held in an elevator and pushed around by two coworkers." *Id.* at 8. Elhanafy also mentions in his complaint that he was asked by a supervisor whether he hated black people. *Id.* ¶¶ 4, 8.

To make out *prima facie* case for hostile work environment under Title VII, Elhanafy must show: "(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and alterations omitted). "Title VII hostile work environment claims are subject to demanding standards in order to avoid construing the statute as a general civility code." *Ghaly v. U.S. Dept. of Agric.*, 739 F. Supp. 2d 185, 196 (E.D.N.Y. 2010). "[I]solated remarks and epithets are insufficient to establish a hostile work environment claim." *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 312 (E.D.N.Y. 2003) (citing *Schwapp*, 118 F.3d at 110). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005) (quoting *Alfano*, 294 F.3d at 373) (internal quotation marks omitted), *abrogated on other grounds by Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 123 (2006).

Elhanafy's complaint and the factual record before me suggest three possible incidents of harassment or intimidation: (1) Elhanafy was asked by the EMS chief, Lennox Joslyn, whether he hated black people; (2) on January 21, 2009, Elhanafy was pushed around in

the elevator by his co-workers, while being called "a little girl," "a pussy" and a "little fag"; and (3) on December 29, 2008, Elhanafy overheard his co-workers insult him and make rude references to his ethnicity in the locker room, and then the biggest one threatened Elhanafy that he would "kick his little ass."

These isolated incidents do not amount to a workplace that "was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [Elhanafy's] work environment." *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003). The question to Elhanafy of whether he "hates black people" at most constitutes an offensive utterance – it is not even a "sporadic racial slur[]," much less "a steady barrage of opprobrious racial comments," as is necessary to establish a hostile work environment claim. *See Ghaly*, 739 F. Supp. 2d at 196 (quoting *Schwapp*, 118 F.3d at 110-11). Moreover, even if there were an initial basis for imputing the conduct of Elhanafy's co-workers to Elhanafy's employer, such an imputation would be substantially mitigated by the evidence that Elhanafy's employer took action after each of the incidents with co-workers that he reported: based on the first, Elhanafy's supervisor called a meeting in which all of the individuals involved apologized to each other; and as a result of the second incident, Elhanafy was moved to the day shift. Elhanafy reported no further incidents after January 2009 until the end of his employment in September 2009. Clearly, his workplace was not so permeated by discriminatory intimidation and abuse that it altered the terms or conditions of his employment nor "unreasonably interfere[d] with [his] work performance." *See Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001).[12]

---

[12]     Also, to the extent the various incidents can be linked to Elhanafy's membership in a protected class, they suggest different bases of discrimination: the "do you hate black people" question seems to suggest racial discrimination, the elevator incident would seem to suggest sex or sexual-orientation discrimination, and the locker

(iii)  *Retaliation*

Elhanafy placed a checkmark on his complaint indicating he was asserting a claim for retaliation.  *See* Am. Compl. ¶ 4.  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show "(1) that []he was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that []he suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 79 (2d Cir. 2001) (internal quotation marks omitted).  A plaintiff was engaged in a "protected activity" if he "had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII or the ADEA."  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (internal quotation marks and alterations omitted).  A causal connection between the protected activity and the adverse action may be demonstrated by showing "(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities."  *Ashok*, 289 F. Supp. 2d at 314 (quoting *McNair v. New York City Health and Hosps. Corp.*, 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001)).  In order for temporal proximity to establish causality, the intervening period must be "very close," *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) – generally no more than a couple months, at most. *Ashok*, 289 F. Supp. 2d at 314 (citing, *inter alia*, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (passage of three months too long to establish retaliation for an EEOC complaint)).

---

room incident suggests national origin discrimination.  Thus Elhanafy was not subjected to continual harassment on any particular discriminatory ground.

The adverse employment action about which Elhanafy complains is his termination from employment. The only plausible "protected activities" engaged in by Elhanafy *prior* to his termination were the internal complaints he submitted in December 2008 and January 2009. Particularly in his January 2009 complaint – in which he mentioned that he had a "feeling[]" that he was "being discriminated against because of [his] race," *see* 1/22/09 Incident Report (Lynch Dec. Ex. 14) – Elhanafy may have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII.

However, there is no basis for concluding that Elhanafy's termination in September 2009 was causally connected to his January 2009 internal complaint. A full eight months passed between Elhanafy's last complaint and his eventual termination. Therefore, there is insufficient temporal proximity to establish causation. Neither is there any direct proof of retaliatory animus against Elhanafy nor any evidence that the VA treated employees that were similarly situated to Elhanafy differently than him. In sum, there is no evidence – much less enough that would allow a reasonable juror to conclude that Elhanafy had satisfied his burden of proof – of any causal connection between Elhanafy's internal complaints in December 2008 and January 2009 and his termination in September 2009.

CONCLUSION

Elhanafy's claims of discrimination based on religion, age, and disability are administratively unexhausted and therefore dismissed. Similarly, any claims predicated on a failure to promote are also unexhausted and thus dismissed. Although Elhanafy's claims of discrimination, retaliation, and hostile work environment, on the asserted bases of race, color, sex, and national origin, are exhausted, they are without merit and the defendant is entitled to

judgment as a matter of law on these claims.  Because no claims in this case survive summary

judgment, the Clerk is directed to enter judgment in favor of the defendant and close the case.

So ordered.


John Gleeson, U.S.D.J.

Dated: June 12, 2012
    Brooklyn, New York